Short *v.* Stotts.

## SHORT *v.* STOTTS.

SUPREME COURT.—*Practice.—Amendment.*—Error in overruling a demurrer to a complaint is not available on appeal to the Supreme Court, where, subsequent to such ruling, an amended complaint is filed.

MARRIAGE.—*Contract.—Breach.—Action.—Common Law.*—An action at common law, in a common law court, existed long prior to the fourth year of James I., for a breach of a marriage contract.

SAME.—*Ecclesiastical Courts.*—The establishment of separate ecclesiastical courts in England by William I. was not part of the common law, and the statutes of England in relation to such courts were not in aid, but in derogation, of the common law, were local to England, and were never in force in this State.

SAME.—*Statute of Frauds.*—A promise to marry is not void by the statute of frauds merely because not made in writing.

SAME.—*Character.—Impeachment.—Evidence.*—In an action for a breach of a marriage contract, the character of the plaintiff for chastity can not be attacked by evidence of statements of a deceased person concerning such chastity.

SAME.—*Instruction to Jury.—Record.—Supreme Court.*—Where, in such case, on appeal to the Supreme Court, the evidence is not in the record, an instruction to the jury, that they might consider evidence of illicit intercourse between the plaintiff and defendant, so far as the same tended to prove or disprove the question in issue, will be presumed to have been proper.

From the Daviess Circuit Court.

*J. H. O'Neal* and *S. W. Short*, for appellant.

*G. Putnam* and *G. W. Friedley*, for appellee.

WORDEN, J.—Action by the appellee, against the appellant, for breach of contract for marriage.

Issue; trial by jury; verdict and judgment for the plaintiff.

The following are the errors assigned:

"1st. The circuit court erred in giving judgment against the defendant, upon a complaint that contains no good cause of action;

"2. In giving judgment upon a cause of action barred by the statute of frauds;

"3d. In overruling defendant's first demurrer to the amended complaint;

"4th. In overruling defendant's demurrer to the amended complaint upon which the cause was tried; and,

"5th. In overruling the defendant's motion for a new trial."

There is nothing in the third assignment of error.

A demurrer to the complaint for want of sufficient facts was overruled, and afterward the plaintiff, on leave, amended her complaint again, so that the complaint to which the first demurrer was filed went out of the case.

It is not material whether the complaint which thus went out of the case was good or bad.

The material question is, whether the complaint on which the case was tried was good, or otherwise; and this is all the question that is raised by the first, second and fourth assignments of error.

The complaint on which the case was finally tried consisted of two paragraphs, the first of which is as follows:

"The plaintiff, Margaret Stotts, for her amended complaint herein, complains of the defendant, Samuel W. Short, and says, that, on the 1st day of July, 1869, she was, and still is, unmarried; that, on said day, the defendant, in consideration of a promise by plaintiff that she would marry him, undertook and agreed to marry the plaintiff within a reasonable time thereafter, upon request; that the plaintiff, confiding in said promise, has always since remained, and is now, ready and willing to marry the defendant; but she avers, that the defendant, although often by her since thereunto requested, and especially so requested on or about the 10th day of March, 1870, has theretofore, then, and ever since refused, and still refuses, to marry the plaintiff; and, further, that on the 15th day of September, 1871, at the county of Monroe and State of Indiana, the defendant, in violation of his promise to her as aforesaid, married one Jennie Batterton; and plaintiff avers, that, by reason of the refusal and failure to marry her as defendant had promised and agreed to do, she became sick and greatly afflicted in body and mind, and so remained

sick and distressed from that time to the present; and for all the matters herein complained of she says, she has been damaged in the full sum of five thousand dollars, for which sum she demands judgment, and for all other proper relief."

The second paragraph is not essentially unlike the first. It sets up mutual promises to marry, and that the defendant had broken his promise and married Jennie Batterton.

We need not, for the purposes of the case, set out the second paragraph.

The counsel for the appellant, in an elaborate brief, take the position that the complaint is not good, because there is no law in Indiana which authorizes an action to recover damages for the breach of a contract to marry.

The position of the counsel is, that the only law governing this State is:

"First. The Constitution of the United States and of this State.

"Second. All statutes of the General Assembly of the State, in force, and not inconsistent with such constitutions.

"Third. All statutes of the United States, in force, and relating to subjects over which Congress has power to legislate for the states, and not inconsistent with the Constitution of the United States.

"Fourth. The common law of England and statutes of the British parliament, made in aid thereof, prior to the fourth year of the reign of James the First, (except," etc.,) "and which are of a general nature, not local to that kingdom, and not inconsistent with the first, second, and third specifications of this section." 1 R. S. 1876, p. 605, sec. 1.

A like provision in reference to the common law of England, and the statutes made in aid thereof, was adopted by the governor and judges of the then territory as early as 1795. Stevenson v. Cloud, 5 Blackf. 92.

And it has probably been continued in every revision of the statutes of the State since its organization. Substantially the same provision was adopted by the convention of Virginia in 1776. 1 Kent Com., 12th ed., p. 473, note *a*.

Perhaps the territories and states north-west of the Ohio river, which adopted the provision, drew it from Virginia.

It may not be unworthy of observation, that the fourth year of the reign of James I., 1607, was the year of the founding of Jamestown, an event which, it may be supposed, led to the fixing of that particular date.

We proceed to state the appellant's argument more definitely.

It is claimed, that, as the sources of our law are as above stated, and as neither the common law of England nor any statute made in aid thereof, prior to the period mentioned, 1607, authorized such action, it follows that we have no law which authorizes the action.

The counsel for the appellant, in their brief, which shows much industry and research, claim, that, prior to the year 1607, the contract for marriage was one exclusively of ecclesiastical, and not of common law, jurisdiction; and that, prior to that time, no action had been maintained in a common law court for the breach of such contract. We are referred, by counsel, to the case between *Stretcher* and *Parker*, 1 Rol. Abr. 22, as the first case in which such action was maintained in England, and this was in 1639.

We have not found any case of an earlier date.

The case of *Holcroft* v. *Dickenson*, Carter, 233, decided in 25 Car. 2, is an important one, and shows, as it seems to us, that it was always regarded as a principle of the common law, that an action would lie for damages in such case.

The case is stated thus:

"An action on the case upon a promise: The plaintiff

declares, that the 10th of November 21 Car. 2 in consideration she did assume and promise to marry the defendant within a fortnight, the defendant did assume and promise within a fortnight to marry her; and says, that this hindered her preferment to her damage of 100 pounds: Verdict for the plaintiff."

On motion in arrest of judgment, three of the four judges were in favor of entering judgment for the plaintiff.

ELLIS, Justice, thought the action well brought, and said, amongst other things:

" My reason is, here is a mutual contract betwixt the parties about a lawful thing, and I hold it is not merely a spiritual act. True, ecclesiastical courts have conusance of it. If one pleads, *nient accouple en loyal matrimony*, they shall judge and bind us; but if he plead *nient sa feme*, it shall be tried by the common law. Anciently marriage did not belong to the ecclesiastical court; not till the time of Pope Alexander the Third. Selden will tell you what the rights of marriage were originally, it was not a thing of ecclesiastical jurisdiction. If a suit were in this court concerning a marriage to be executed *in specie*, we have nothing to do in it; when there is *actus contra actum*, action will lye at common law. We bring not the action to meddle with the marriage, but for the damages, that he hath not taken her according to his promise."

ATKINS, Justice, said:

" I am for judgment for the plaintiff. It hath been strongly objected, that here is nothing in the case, but what is of meer ecclesiastical conusance. In the ancient Year-Books the matter is much disputed, yet the Year-Books are with some distinction, 45 Ed. 3. 24. If the promise to marry be by deed, then its triable at common law, otherwise not if without deed. * * * Later authorities are full.

" Object. This entitling the common law courts to promises of marriage was in troublesom times.

" Resp. *Stretcher and Parker's Case* was before the troublesom times." Here follows the citation of other authorities, and the opinion proceeds: "It is not for us to go contrariant to these judgments; that which toucheth matrimony, whether lawful or not lawful, ought to be tried in the spiritual court; but in our case the spiritual court cannot give remedy for damages."

WINDHAM, Justice, said:

"An action upon the case upon a promise for a portion, this is not our case properly; and the cases cited are put where marriage was consummated. In our case there is no marriage, no way whereby the ecclesiastical court can be entitled to it. The books speak much of the consideration of the act being grounded upon ecclesiastical matter, that therefore it ought to be questioned there; yet the books all agree, that if there be a temporal matter doth interpose whereupon the action is grounded, remedy may be had at the common law; a man may sue for one thing in the ecclesiastical court, and at common law too. One sues for a pension properly in the spiritual court; yet if it be upon a grant by the parson and patron, he may sue for it at the common law; that case 45 Ed. 3. 24. which puts the distinction of a deed and no deed, I can not understand the difference, for one is as much a temporal act as the other is; the cases are infinite. You will not find a case as ours is, where the marriage is not consummate. As our case is, I think the action will lye: here is a mutual promise. Mutual promises are good considerations to support actions upon the case; in our case there is a mutual promise, and a promise of marriage too, than which is no greater consideration."

VAUGHAN, Chief Justice, was of a different opinion. He said, amongst other things:

"A promise to take one to husband absolutely, notwithstanding any impediment; this is not a good promise, and

the impediments of marriage are to be judged in the spiritual court; and this reason differs this case from the rest. If a man call another heretick, an action lies not here, because if the defendant justifie, this court can not judge of it: And so is our case, if she promised to marry him absolutely, and an action brought against her, here she can not alleadge an impediment, as she might do in the ecclesiastical court, and the promise in question must be necessarily intended, if there were no impediment."

We have thus quoted largely from the opinions of the judges in the foregoing case, not only for the purpose of showing the views of the court upon the question involved, but also of illustrating, in some degree, the struggle between the courts of common law and the ecclesiastical courts.

In Anglo-Saxon times, there was no distinction between the lay and ecclesiastical jurisdiction; the county court was as much a spiritual as a temporal tribunal; the rights of the church were ascertained and asserted at the same time, and by the same judges, as the rights of the laity. It was not until after the Norman conquest, that the common law and the ecclesiastical courts were separated, and the latter invested with sole jurisdiction over ecclesiastical causes. 3 Chitty's Bl. Com., pp. 61 to 63.

Until the pontificate of Pope Alexander III., which commenced, we believe, in 1159, marriage, it seems, was not a subject of ecclesiastical jurisdiction.

Now, the case from which we have so largely quoted establishes, that, by the principles of the common law, which existed long anterior to 1607, an action for the breach of a contract for marriage will lie. Indeed, the principle which upholds such action is as old as the principle which gives damages in any case for the breach of a contract. And it is immaterial whether any case can be found in England, prior to 1607, in which such action has been maintained.

The principle is what we have adopted as a part of the

common law. The doubt which seems to have arisen in the early cases was, not whether, on the principles of the common law, the action would lie, but whether, as the ecclesiastical courts had conusance of matrimonial matters, such action could be maintained in a common-law court. Thus, VAUGHAN, Chief Justice, in the case above cited, thought it could not, because, if there was any impediment to the marriage, it could not be shown in the common-law court.

But the establishment of separate ecclesiastical courts in England was no part of the common law. William I., says Blackstone, " was at length prevailed upon to estab-·lish this fatal encroachment, and separate the ecclesiastical court from the civil." 3 Bl. Com. 62.

Nor were any statutes of England, on the subject of such separate ecclesiastical courts, statutes in aid of the common law, but rather in derogation of it; and they were local to that kingdom, and never in force here. The whole system of English ecclesiastical courts, as separate from the civil, is foreign to our institutions, and has no place in our jurisprudence. There is here, therefore, no conflict of jurisdiction between the courts of the one class and the other. Here, all wrongs are redressed, and remedies furnished, in the civil tribunals.

And there is no reason why an action may not be maintained for the breach of a contract for marriage, in our courts, according to the principles of the common law. Besides this, the statute has recognized the right of bringing such action, by giving the circuit court jurisdiction thereof. 2 R. S. 1876, p. 6, sec. 5.

We proceed to another point made by the appellant. It is insisted, that the contract is within the statute of frauds, which provides, that no action shall be brought " to charge any person, upon any agreement or promise, made in consideration of marriage," unless the contract shall be in writing. 1 R. S. 1876, p. 503, sec. 1, clause 3.

Our statute, in this respect, is like that of 29 Car. 2, of which Chitty says:

"Nor need a promise to marry be reduced into writing; for the statute 29 Car. 2, c. 3, s. 4, applies to promises 'in consideration of marriage,' not to promises to marry." 2 Chitty Contracts, 11th Am. ed., p. 791.

To the same effect are the cases of *Clark* v. *Pendleton*, 20 Conn. 495, and *Ogden* v. *Ogden*, 1 Bland, 284.

Whatever may have been the early decisions upon this point, the law is well settled as above stated.

We are of opinion, that the complaint was good. This disposes of all the errors assigned except the last, the overruling of the motion for a new trial.

The counsel for the appellant have discussed, under this assignment, the propriety of an amendment allowed to be made to the complaint, and the refusal of the court to continue the cause. Without stopping to consider whether these points are properly presented by the record, we are of opinion that the amendment was properly allowed, and the continuance properly refused.

It appears by a bill of exceptions, that, on the trial of the cause, the plaintiff having given evidence of her general character for chastity, the defendant offered to prove the statement of one Johnson, who was dead at the time of the trial, to the effect that he had had sexual intercourse with her; but, on objection, the evidence was excluded. This was clearly right. The statements of Johnson could have been but hearsay. The plaintiff had a right, even if her character for chastity could be assailed by proof of specific facts, to have the evidence come under the sanction of an oath. The death of Johnson may have been a misfortune to the defendant, but that was no ground for admitting his unsworn statements in evidence.

The court gave to the jury the following instruction:

"So far as any testimony in the case, which may go to show a seduction or mere illicit intercourse between the parties, may tend to prove or disprove the question in

issue, that is, whether the parties contracted to marry each other, the jury may consider it."

This instruction is objected to. The evidence is not in the record, and we can not tell what the evidence was to which the instruction applied, nor whether it was introduced by the plaintiff or defendant; nor can we say whether it was introduced by consent, or otherwise, of the parties. We can not say there was any error in the instruction. It was but saying, that, if the evidence going to show a seduction, or illicit intercourse between the parties, tended to prove or disprove the issue, it was to be considered. This must be true of all competent evidence that tends to prove or disprove the issue, and no question is made in the record as to the competency of the evidence.

We have thus passed upon the questions arising in the record, and find no error in the case.

The judgment below is affirmed, with costs.

Petition for a rehearing overruled.