[Crim. No. 9420. Third Dist. Feb. 21, 1978.]

In re VICTOR CARRAFA on Habeas Corpus.

## COUNSEL

Michael Satris, under appointment by the Court of Appeal, for Petitioner.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Willard F. Jones and Jane Kirkland Fischer, Deputy Attorneys General, for Respondent.

## OPINION

**REYNOSO, J.**—Petitioner, Victor Carrafa, an inmate at Folsom State Prison, by his habeas corpus proceeding challenges the actions of the Department of Corrections (Department). The Department has prohibited, at least temporarily, his marriage with his fiancée, Joan Vibbard.[1]

█ The right to marry is a statutorily recognized fundamental constitutional guarantee. The right was impermissibly infringed. Prison authorities erroneously ruled that denial of general visitation rights to the bride also justified the denial of the marriage request. We conclude that

---

[1]The challenge to the Department's action was properly brought by writ of habeas corpus. (*In re Harrell* (1970) 2 Cal.3d 675, 682 [87 Cal.Rptr. 504, 470 P.2d 640].)

the Department must permit petitioner's marriage.[2] Prison security may properly be considered by the Department in making arrangements for the ceremony.

Petitioner requested permission to marry his fiancée. The request, dated May 23, 1977, was to marry on June 29, the date already set for weddings. Permission was denied.

On June 4, 12 days after the request, a pistol and other contraband were found in prison. Petitioner was immediately placed in an isolated security unit. The next day he was informed in writing that he had been placed in the security unit pending the investigation. Prison authorities later advised petitioner that his "lock-up" was for his protection; they had received information that his murder was planned by other inmates. After 15 days, on June 20, petitioner was placed back in the general prison population.

Petitioner's fiancée's visitation rights were suspended apparently between June 20 and June 28. On the 28th she was advised in writing that the suspension was "due to information leading us to believe that you were involved [in] the smuggling of a firearm and narcotics" into prison. The suspension was also based on falsification of her residence address on the "visiting questionnaire."

Two further letters from prison authorities to petitioner's fiancée explained the suspension. During the investigation, according to a July 15 letter, "reliable information" revealed that she, Joan Vibbard, was involved in the introduction of large amounts of marijuana to the prison. Further, the method of introduction (hiding marijuana in prison service vehicle tire) was the same as that used to introduce the pistol. Secondly, the pistol found by prison authorities had been serviced prior to its introduction to prison. The repair "tag" listed Sharon Smith as the person who had the gun serviced. During that period the same address was used by Joan Vibbard. On July 25 yet another letter was sent. She was advised that she could not visit the prison until the investigation was complete. The letter explained that the investigation dealt with the "smuggling of a gun" and that she was "implicated" as being possibly involved.

---

[2]The marriage of the parties will materially change their circumstances. Accordingly, we will not deal with petitioner's challenge to the restriction of visitation rights.

In addition to the explanations contained in the letters, the record reveals that prison authorities had other information. They considered the inmate, whom they believed to be involved in the gun incident, petitioner's "associate." Further, no person by the name of Sharon Smith had been found who lived at the address listed on the "tag" at the time the pistol was serviced.

The petition to marry, as previously indicated, was denied. The letter sent Joan Vibbard dated July 25 also responded to her complaint that she has been unable to marry petitioner. She was told that she could renew her application to marry when her visitation rights were restored. The date of the actual denial is July 29, 1977; petitioner's uncontradicted assertion is that he was not advised until August 19. The denial appears on the bottom of the internal memorandum recommending approval of the "marriage request"—the denial reads: "Denied. Bride not approved visitor."

Meanwhile, on July 27, petitioner filed a writ of habeas corpus before the Superior Court of Sacramento County. The writ was denied August 11, 1977. The petition for writ of habeas corpus before this court followed. As of December 15, the date of oral argument, permission to marry had apparently not been granted.

## I

The right of prisoners to marry has been codified (Pen. Code, §§ 2600-2601.) Section 2601 declares: "Notwithstanding any other provision of law, each such person shall have the following civil rights: [. . .] (f) [t]o marry." Our Supreme Court has explained the historical setting of this statutory declaration: "We have, in this state, 'long since abandoned the medieval concept of strict "civil death" and have replaced it with statutory provisions seeking to insure that the civil rights of those convicted of crime be limited only in accordance with legitimate penal objectives.' [Citation omitted.] To that end, the Legislature, in 1968, amended the 'Civil Death' statute, section 2600, to provide that certain basic rights be retained by prisoners." (*In re Van Geldern* (1971) 5 Cal.3d 832, 836 [97 Cal.Rptr. 698, 489 P.2d 578].)

The right to marry is a fundamental constitutional right (*Perez* v. *Sharp* (1948) 32 Cal.2d 711, 714 [198 P.2d 17]; *Loving* v. *Virginia* (1967) 388 U.S. 1, 12 [18 L.Ed.2d 1010, 1018, 87 S.Ct. 1817].) The codification of that right emphasizes its fundamental nature. "The civil rights set forth

in section 2600 are fundamental guarantees which may not arbitrarily be infringed." (*In re Van Geldern, supra,* 5 Cal.3d 832, 836.)

■ A prisoner may not be deprived of such a right except "as is necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." (Pen. Code, § 2600.) Such a limitation is not a " 'straightjacket limiting the ability of the prison authorities to deal with institutional realities.' " (*In re Van Geldern, supra,* at p. 837.) Rather "[v]alid and compelling institutional considerations may necessitate certain *limited inroads* upon the exercise of the prisoner's civil rights." (*Ibid.*; italics added.)

■ However, when state action infringes a fundamental right of the petitioner, the state action can be upheld only if necessary to effect an overriding governmental interest. The government must show that its interest cannot be satisfied by alternative methods less restrictive of the individual right abridged. Otherwise, the infringement must fail. (*Payne* v. *Superior Court* (1976) 17 Cal.3d 908, 914 [132 Cal.Rptr. 405, 553 P.2d 565].) As we explain below, the government has failed to meet that burden.

## II

The Department argues that it is not depriving petitioner of the right to marry. Rather the marriage is delayed only until the conclusion of a pending investigation. The delay, the Department argues, is essential to prison security.

We disagree. We deal with the reality that delay prevents exercise of that right. (See *In re Harrell, supra,* 2 Cal.3d 675, 703.) Denial of petitioner's right to marry does not appear to be the only alternative available to the state in protecting its legitimate interest in prison security. First, his fiancée indicated her willingness to submit to a body search and noncontact visits if that would improve prison security. Thus, the possibility of smuggled contraband is virtually eliminated. Second, the mere fact of marriage does not preclude the Department from excluding the marriage partner if it believes that there is a legitimate security risk. (Cal. Admin. Code, tit. 15, § 3176.) The Department has failed to demonstrate the unavailability of any reasonable alternative to protect prison security.

As indicated, a spouse may be excluded when appropriate. Thus, we draw a clear distinction, not recognized by the Department in this case, between the right to marry and the right of visitation. The right to marry may not be impinged or delayed unless security is endangered at the time and place of the marriage. Visitation rights are quite another matter.

A writ of habeas corpus will issue directing the Department of Corrections to permit petitioner's marriage under such circumstances as will respect prison security.

Friedman, Acting P. J., and Evans, J., concurred.

A petition for a rehearing was denied March 7, 1978, and petitioner's application for a hearing by the Supreme Court was denied April 20, 1978.